Farris Eugene LIMUEL, Appellant,

v.

The STATE of Texas, Appellee.

No. 54592.

Court of Criminal Appeals of Texas,
Panel No. 2.

May 3, 1978.

Rehearing En Banc Denied May 24, 1978.

Laird Palmer, Austin, for appellant.

Ronald D. Earle, Dist. Atty., and Richard E. Banks, Asst. Dist. Atty., Austin, for the State.

Before ONION, P. J., and DALLY and VOLLERS, JJ.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for aggravated robbery, where the punishment was assessed at sixteen (16) years' confinement in the Department of Corrections following a bench trial on a plea of not guilty.

█ Appellant first contends the evidence was insufficient to support the trial court's finding of guilty.

The State's evidence reflects that on the evening of December 25, 1974 about 7:30 or 8 p. m. fifty-six year old Leslie Floyd was walking in the 1000 block of Lydia Street in Austin when he was accosted by the appellant and one Joe Newman. Appellant pulled a knife and stabbed Floyd in the stomach. A $1.50 in money, a Timex watch and a chicken lunch were taken in the robbery. When the appellant was arrested a short time later, he was in possession of a bloody knife.

Appellant testified that Floyd and Joe Newman were engaged in a fight and that he had tried to break it up. He denied that he robbed or stabbed Floyd. Joe Newman testified he had committed the robbery and had stabbed Floyd and that the appellant had not taken part in the robbery but had only tried to "break up the fight." Holoman Bracy and James Hunt, patrons of a bar across the street from where the events took place, corroborated Newman's testimony. Bracy related he heard and saw Newman arguing with some old man, and saw the appellant leave the bar and break up the fight. Hunt testified he saw the appellant run across the street and take a knife away from Newman after an old man had hollered for help. Appellant's sister testified that seven months after the event Floyd had told her he did not know who stabbed him and that all he knew was "what they told me."

Although Floyd identified the appellant as his assailant, appellant argues Floyd's memory was hazy about the event and that he was shown one or two photographs while he was in the hospital and that Floyd's nephew was present at the time and told him the appellant was the one who had stabbed him.

After stating he did not know the appellant prior to the alleged robbery, Floyd stated he had pointed out to the police the two men who had robbed him as they fled from the scene. The record reflects the following interrogation on cross-examination.

"Q All right. So, when these men, whoever stabbed you, and they ran, you told the police. You pointed—

"A I told the police. I pointed them out.

"Q Now, what name did you tell them?

"A I told them one of them was Limuel.

"Q I thought you said you didn't know that—

"A Well, I pointed—I asked another boy who was it. It was Floyd Arnold. He was the one told me it was Farris Limuel.

"Q Oh, I see.

"A And then my nephew heard about it and they come up and they was up there when he brought the picture. My nephew showed me—told me—I told him which size it was.

"Q So, you were told by somebody else the person who stabbed you was Farris Limuel, is that correct?

"A Uh-huh.

"Q Is that right?

"A Yeah. And when the policeman come, he—no, he wasn't no policeman. I guess he's a secret detective or something—came and pulled a picture out and said here's my watch. I don't know who it was."

It appears from the above that Floyd learned the name of his assailant at the scene from a Floyd Arnold and pointed him out to the police. Austin police officer Larry Stafford testified that at the time in question he saw the appellant and Newman, both of whom he knew, running in the 1000 block of Lydia Street and then enter a bar. They fled from the bar as an older man, later identified by Stafford as being Floyd, came up. Floyd then told the officers, "That's them, stop them." A "pickup" was placed by Stafford for the appellant and Newman and an ambulance was ordered for Floyd. Austin police officer Jerry Morgan testified that about 8:30 p. m. on the day in question he stopped a car in which the appellant was a passenger and arrested him, and that at the time appellant was in possession of a Timex watch and a brown and cream colored pocket knife with blood still on the blade.

■ It is clear from the above that there was sufficient evidence to support the trial court's finding. The trial court was the trier of the facts, the credibility of the witnesses and the weight to be given to their testimony. The court was free to accept or reject the testimony of any witness. It is obvious that the court chose to believe the State's version of the facts. The above quoted testimony reflects the events concerning the identification of appellant's picture by Floyd in the hospital were not well developed, nor was the language used in some of the answers very clarifying. Under any circumstances, it was not such as to render the evidence insufficient to support the trial court's finding of guilt.

■ By supplemental brief appellant urges that the evidence was insufficient to show that the knife used was a deadly weapon as alleged in the aggravated robbery indictment.

V.T.C.A., Penal Code, § 1.07(a)(11), reads:

" 'Deadly weapon' means:

"(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or

"(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."

■ An ordinary pocket knife is not manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury. Therefore, if such pocket knife becomes a "deadly weapon," proof must show that it became one because in the manner of its use or intended use it was capable of causing death or serious bodily injury.

It has been held under the former Penal Code, as well as the present Penal Code, that a knife is not a deadly weapon per se. *Harris v. State*, 562 S.W.2d 463 (Tex.Cr. App.1978); *Danzig v. State*, 546 S.W.2d 299 (Tex.Cr.App.1977); *Windham v. State*, 530 S.W.2d 111 (Tex.Cr.App.1975); *Williams v. State*, 477 S.W.2d 24, 25 (Tex.Cr.App.1972); *Barnes v. State*, 172 Tex.Cr.R. 303, 356 S.W.2d 679 (1961); *Henderson v. State*, 55 Tex.Cr.R. 170, 115 S.W. 588 (1909); 4 Branch's Ann.P.C., 2nd ed., § 1573, p. 132.

■ Although a knife is not a deadly weapon per se, it has been held that it can qualify as such through the manner of its use, its size and shape and its capacity to produce death or serious bodily injury. *Richards v. State*, 147 Tex.Cr.R. 118, 178 S.W.2d 517 (1944); *McElroy v. State*, 528 S.W.2d 831 (Tex.Cr.App.1975); *Abels v. State*, 489 S.W.2d 910 (Tex.Cr.App.1973). Under the former Penal Code there was no statutory definition of deadly weapon, *Mosley v. State*, 545 S.W.2d 144 (Tex.Cr.App. 1976) (footnote # 3). The current Penal Code, as observed, does contain such a defi-

nition and broadens the above considerations to include "or its intended use." Further, it has been held that the wounds inflicted on the injured is also a factor that is considered in determining the character of the weapon. *Reed v. State*, 149 Tex.Cr. App. 208, 192 S.W.2d 890 (1946); *Williams v. State*, 477 S.W.2d 24 (Tex.Cr.App.1972). This does not, however, mean that wounds must be inflicted before a knife can be determined to be a deadly weapon. See and cf. *Richards v. State*, supra.

In the instant case while there was no medical testimony as to the nature of the wounds, and while the knife taken from appellant's possession was not introduced into evidence, we conclude the evidence sufficient to show the knife used to be a deadly weapon.

Floyd testified that the appellant slipped up behind him and grabbed him, placed a knife in his throat. Appellant then stated, "Give me what you got," and after taking Floyd's money, he came around to the front and stabbed Floyd in the stomach. Floyd explained that "he stick into my liver. Had to operate on me that night." Floyd testified that he was in the hospital from December 25, 1974 to January 3, 1975 and that "they had me all sewed up, and I was too sore to raise up." Officer Stafford related that when he first saw Floyd on the night in question he observed blood on Floyd's abdomen and when Floyd pulled his shirt up he saw a one inch cut across the stomach.

The manner in which the knife was used and the wound inflicted were sufficient to bring the knife within the definition of the deadly weapon. V.T.C.A., Penal Code, § 107(a)(11)(B).

Appellant also complains he was denied his due process rights by an improper pretrial identification procedure. He argues Floyd's in-court identification of him was tainted by a photographic display which was impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. He cites *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

Appellant calls attention to Floyd's testimony on direct examination, offered without objection, that he had looked at some pictures when he was in the hospital. The record then reflects:

"Q  Did they show you some pictures?
"A  Yes, sir.
"Q  How many pictures did they show you?
"A  Two.
"Q  And who were the pictures?
"A  I pointed out that guy right there (indicating)."

It is observed that "they" are never identified. Subsequently on cross-examination, Floyd mentioned a picture brought by his nephew, who had gone to school with the appellant, and a picture pulled out by a "secret detective." This is all set out above in the testimony quoted in connection with another ground of error, but it is not clear whether either was a picture of the appellant.

The two part test laid down in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), is that first, the photographic display itself must be impermissibly suggestive and next, it must give rise to a very substantial likelihood of irreparable misidentification. See also *White v. State*, 496 S.W.2d 642 (Tex.Cr. App.1973); *Atkinson v. State*, 511 S.W.2d 293 (Tex.Cr.App.1974). In determining whether a photographic display is impermissibly suggestive, thus tainting the in-court identification, the court should examine the totality of the surrounding circumstances. Each case must be decided on its own facts. *Simmons v. United States*, supra; *Atkinson v. State*, supra, and cases there cited.

We observe that there was no objection to the in-court identification when offered, and while the State should not have attempted to bolster that identification without first showing that any photographic display met the two prong test of *Simmons*, there was no objection when such bolstering took place. The testimony elicited by both the State and the appellant concerning

the display of any photographs to Floyd was meager and confusing, and Floyd did not testify as the complaining witness did in *Coleman v. State*, 505 S.W.2d 878 (Tex. Cr.App.1974), that his in-court identification was based on photographic display and he could not have identified the appellant without the aid of the photographs, all of which were of the same man.[1]

▮▮▮ There are several reasons why we conclude no reversible error is shown. Whether there exists at the same time a "substantial likelihood of misidentification" depends on whether there was a distinct observation at the time of the event which, in light of the surrounding circumstances, can be considered credible enough to serve as an independent origin for the in-court identification. *Clay v. State*, 518 S.W.2d 550 (Tex.Cr.App.1975). In the instant case Floyd had adequate opportunity to observe the appellant at close range during the course of the robbery, and was told appellant's name as he fled from the scene. There was an independent origin for the in-court identification. *Clay v. State*, supra. From a totality of the surrounding circumstances, we do not conclude that the photographic display, if any, was impermissibly suggestive.

Further, it should be remembered that appellant and all his witnesses testified that he was on the scene at the time of the robbery. The defense testimony was that appellant was a good Samaritan and took the knife away from Newman in an attempt to aid Floyd. It was Floyd's testimony that appellant participated in the robbery and stabbed him. There was no question that appellant was present at the time of the events in question. The error, if any, in any pre-trial identification procedure, was harmless beyond a reasonable doubt.

The judgment is affirmed.

1. The testimony called to our attention does not support appellant's assertion that Floyd testified his in-court identification was based on the pictures. Floyd did testify that he could not remember which man assaulting him said "Give me that watch." The record then reflects the following on cross-examination:

"Q You were frightened and you don't remember?

"A I don't remember. But I do know he's the one that stabbed me, because when he brought the picture—

"Q Well, were you frightened when the man walked up behind you and put his arm around your neck?"