**Juan RIVERA, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–07–00247–CR.**

Court of Appeals of Texas, San Antonio.

Aug. 13, 2008.

Michael V. Garcia, Alice, TX, for Appellant.

Joe Frank Garza, District Attorney—79th Judicial District, Jim Wells & Brooks Counties, Alice, TX, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, PHYLIS J. SPEEDLIN, Justice, STEVEN C. HILBIG, Justice.

## OPINION

Opinion by STEVEN C. HILBIG, Justice.

A jury convicted appellant Juan Rivera, Jr. of aggravated assault with a deadly weapon. On appeal, appellant contends the evidence is legally and factually insufficient to establish he used or exhibited a deadly weapon. Because we agree the evidence is factually insufficient to sustain the deadly weapon finding, we reverse and remand for a new trial.

### BACKGROUND

Justin Lerma, the complainant, was at his mother-in-law's home with his friend, "Mike." Lerma testified he and Mike were outside the home when "these guys just showed up." The "guys" included Mark Guerra, Oscar Carrillo, and appellant. According to Lerma, Carrillo began verbally harassing Mike and him. Lerma stated, "I don't want no problems here," but Carrillo advanced toward him and was intercepted by Mike. Then, according to Lerma, appellant "came around and stabbed me from the back and around my stomach." The evidence showed Lerma attempted to flee, but appellant continued to attack Lerma. Lerma testified he was stabbed "seven or eight" times in his back, stomach, and arm. While Lerma admitted he did not see the weapon used to stab him, his mother-in-law, Teresa Ann Uribe, testified appellant stabbed Lerma with a "pocket knife."

During the altercation, Uribe called 911. Sergeant Odel S. Mendoza was dispatched to respond to "an assault in progress." There were no arrests immediately following the assault, but appellant was ultimately arrested and charged by indictment with aggravated assault with a deadly weapon. After hearing the evidence, the jury convicted appellant of the charged offense. The trial court sentenced him to four years imprisonment.

### ANALYSIS

Appellant argues the evidence is legally and factually insufficient to sustain his con-

viction because the State failed to prove he used a deadly weapon as defined by the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (Vernon Supp.2007).

### Standard of Review

When reviewing the evidence for legal sufficiency, we review all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729–30 (Tex.Crim.App.), *cert. denied*, 546 U.S. 962, 126 S.Ct. 481, 163 L.Ed.2d 367 (2005). Any inconsistencies in the testimony must be resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App.2000). However, when reviewing the evidence for factual sufficiency, we review all of the evidence in a neutral light and set aside the verdict only if "the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met." *Garza v. State*, 213 S.W.3d 338, 344 (Tex.Crim.App. 2007).

### Substantive Law

A person commits an assault if he intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp.2007). The assault is aggravated when the person uses or exhibits a deadly weapon during the assault. *Id.* § 22.02(a)(2). A deadly weapon is one that "in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). "Serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). "Bodily injury" is "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8).

"Although a knife is not a deadly weapon per se, it has been held that it can qualify as such through the manner of its use, its size and shape and its capacity to produce death or serious bodily injury." *Limuel v. State*, 568 S.W.2d 309, 311 (Tex. Crim.App. [Panel Op.] 1978); *see Thomas v. State*, 821 S.W.2d 616, 620 (Tex.Crim. App.1991) (holding that kitchen knives, utility knives, straight razors, and eating utensils are not deadly weapons per se); *see also* TEX. PENAL CODE ANN. § 1.07(a)(17)(B). An object is a deadly weapon if the injuries produced result in death or serious bodily injury. *See Tyra v. State*, 897 S.W.2d 796, 798 (Tex.Crim. App.1995). But if a knife did not cause serious bodily injury or death, to qualify as a deadly weapon the evidence must prove "the actor intend[ed] a use of the [knife] in which it would be **capable** of causing serious bodily injury." *McCain v. State*, 22 S.W.3d 497, 503 (Tex.Crim.App.2000) (emphasis added). The State may establish the knife was capable of causing death or serious bodily injury through witnesses' descriptions of the knife's size, shape, and sharpness; testimony of the knife's life-threatening capabilities; the manner in which the knife was used; the words spoken by the defendant; the physical proximity between the victim and the knife; and the nature of any wounds caused by the knife. *Lowe v. State*, 211 S.W.3d 821, 827 (Tex.App.–Texarkana 2006, pet. ref'd); *Victor v. State*, 874 S.W.2d 748, 751–52 (Tex.App.–Houston [1st Dist.] 1994, pet. ref'd). Expert testimony is not required but it may be useful when the evidence on the deadly nature of the knife is meager. *Davidson v. State*, 602 S.W.2d 272, 273 (Tex.Crim.App. [Panel Op.] 1980). Clear-

ly, whether a particular knife is a deadly weapon depends upon the evidence. *Thomas,* 821 S.W.2d at 620.

### The Relevant Evidence

The evidence regarding the knife used in this assault is meager. The knife was never recovered. Three witnesses offered testimony about the knife used to stab Lerma and the resulting wounds. Sergeant Odel S. Mendoza testified that when he arrived at the scene he observed that Lerma had several wounds. He saw wounds on Lerma's stomach, back area, and rib area and described some of them as "gaping." When he questioned Lerma, Lerma stated he had been "stabbed with a knife." Although Sergeant Mendoza testified he had been trained to determine if wounds are indicative of having been caused by a knife and had investigated several incidents dealing with knife wounds, he did not provide any testimony about the nature of the knife used in the attack based upon his observation of Lerma's wounds. He opined that a knife could be a deadly weapon depending on the manner in which the knife was used. Pictures of Lerma's wounds taken at the hospital demonstrate three wounds: two on Lerma's abdomen and one on the back of his upper left arm.

Lerma admitted he never saw the weapon but he stated "it felt like a knife ... because it was going in like nothing." He testified he received seven to eight wounds on his back, stomach, and arms. Lerma testified Oscar Carrillo stabbed him at least one time with a beer bottle. The evidence shows Lerma was treated at the scene by EMS and later went to the hospital by private vehicle. At the hospital, he was told "it was too late to stitch [him] up," so they "cleaned his wounds" and "put a stick—like little stickers that are like stitches." Lerma testified he was then given pain medication and released. Lerma testified he missed work for approximately one month because he "was in a lot of pain." He further testified that his back still hurt when it was cold.

The only person who testified to seeing the knife was Uribe. She initially testified she saw appellant stab Lemma one time with a "pocket knife." However, when asked how she was able to see the knife when no one else did, Uribe stated she was able to see the knife "[b]ecause of the reflection of the blade, of the point, the reflection of the light." She testified she could see the blade of the knife, but not the handle. When asked if she was able to recognize the object as a pocketknife she responded "[w]ell, not particularly what it was, but yeah." She offered no further description as to the type of knife or the length of the blade.

### Legal Sufficiency

▮ We initially conclude the evidence is legally sufficient to establish Rivera used a deadly weapon. As to the "manner of use" prong of the deadly weapon definition, Lemma testified he was "stabbed." Uribe testified she saw appellant stab Lemma. By common usage and understanding, the jury could rightly conclude Rivera used the knife in a plunging rather than slashing motion. Such actions are sufficient to support the jury's finding that the knife was **used** in a manner capable of causing serious bodily injury. As to the "capacity" prong of the deadly weapon definition, there is some evidence that Lemma may have suffered serious bodily injury. Lemma testified he was stabbed, that his wounds required some hospital treatment, and that the pain kept him out of work for a month. The jury could have concluded from this evidence that the knife caused serious bodily injury because of the "protracted loss or impairment" of Lemma's

bodily function. When viewed in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that the knife used by appellant was a deadly weapon because it caused serious bodily injury. Accordingly, we overrule appellant's first issue.

### Factual Sufficiency

■ While the evidence is legally sufficient, we nevertheless hold the evidence that Rivera used a deadly weapon—a weapon with the capacity to cause serious bodily injury or death—is so weak that the verdict is clearly wrong and manifestly unjust. *See Garza*, 213 S.W.3d at 338. Viewing the evidence in a neutral light, the evidence that Lemma suffered serious bodily injury as a result of a knife wound is meager and contradicted by evidence regarding the actual wounds. Although Lemma went to the hospital, it was in a private vehicle and was apparently after some delay. He received no medical treatment for his wounds other than the application of "stickers" in lieu of any stitches to close the wounds and an initial dose of pain medication. Although Lemma's testimony that the pain kept him from working for one month and his back still occasionally hurt him meets the test for legal sufficiency because of the requirement to view the evidence in the light most favorable to the verdict, it would be clearly wrong and manifestly unjust to conclude serious bodily injury resulted from this fact alone under a factual sufficiency review. There is no evidence that Lemma sought or received any additional medical treatment for his wounds. Therefore, the finding of a deadly weapon cannot rest on proof that Lemma actually suffered serious bodily injury from the attack.

The State could have established the knife was a deadly weapon through evidence of the knife's size, shape, and sharpness; of the knife's life-threatening capabilities; the manner in which the knife was used; the words spoken by the defendant; the physical proximity between the victim and the knife; and the nature of any wounds caused by the knife. *See Lowe v. State*, 211 S.W.3d at 827. Clearly, Lemma's testimony that he was stabbed established the knife was used in a manner to take advantage of whatever life-threatening capabilities it may have possessed. However, neither the knife nor a facsimile of the knife used during the crime was introduced into evidence. None of the witnesses described the knife by its size or the length of the blade. In fact, the best witness for the State on this issue—Uribe—could only say she saw the light reflecting off the point of the "pocketknife".[1] She could not describe the size or length of the handle from which we might infer the length of the blade. There was no medical testimony as to the nature of the wounds or any testimony about the "life-threatening capabilities" of the knife based on the wounds inflicted. While Sergeant Mendoza testified he had some expertise on the nature of knife wounds and described some wounds as "gaping," he presented no testimony on whether the knife used in the attack was a deadly weapon.

The dissent argues the evidence of a deadly weapon is factually sufficient citing Sergeant Mendoza's testimony about knives used as deadly weapons and "gaping" wounds "indicative of an aggravated assault," the finding of a blood trail, wounds that required medical attention, and multiplicity of wounds. While Sergeant Mendoza described some of the

---

1. A pocketknife is defined by Webster's Ninth New Collegiate Dictionary as "a knife that has one or more blades that fold into the handle and that can be carried in the pocket." WEBSTER'S NEW COLLEGIATE DICTIONARY 907 (1984).

wounds as "gaping," no further explanation of that term was provided. There was simply no testimony about the size, length, or depth of any wound. His testimony about knives as deadly weapons was as follows:

Q. Now in investigating, you stated, death scenes where a knife was used, is that what you—

A. Yes sir. I've investigated a few scenes where a knife was used to—to kill somebody.

Q. And in your experience dealing with that investigation, would it be your opinion that a knife can be a deadly weapon?

A. Yes, sir, it can be employed as a deadly weapon as far as cutting somebody and—and puncturing their vital organs, which could mean they cut a carotid artery or something like that, yes, sir.

Q. So that would depend on the manner of use?

A. Yes, sir.

 Sergeant Mendoza's testimony essentially stated that all knives can be deadly weapons depending upon the manner of use. However, he offered no testimony about the knife used in this case. His testimony that "I knew it was some sort of aggravated assault with some sort of weapon" appears to be based on the nature of the wounds rather than the type of weapon. In other words, he thought the wounds demonstrated serious bodily injury which, as discussed above, was not the case. And, that Lemma suffered some wounds does not compel a finding that the knife was a deadly weapon. *See Lockett v. State,* 874 S.W.2d 810, 814 n. 3 (Tex.App.–Dallas 1994, pet. ref'd).

Viewed in a neutral light, the evidence that Rivera's weapon was capable of causing serious bodily injury or death is so weak as to render the jury's verdict on that issue clearly wrong and manifestly unjust and we must sustain appellant's second issue.

### Conclusion

The State failed to produce sufficient evidence in this case about the inherent nature or deadly capability of the weapon used to stab Lemma. Accordingly, we sustain appellant's second issue, reverse the trial court's judgment, and remand to the trial court for a new trial.

Dissenting opinion by PHYLIS J. SPEEDLIN, Justice.

PHYLIS J. SPEEDLIN, Justice, dissenting.

I disagree with the majority's conclusion that the evidence is factually insufficient to support the jury's finding that Rivera used a deadly weapon—specifically, that in the manner of its use or intended use the pocket knife was not "capable" of causing serious bodily injury. As noted by the majority, a knife is not a deadly weapon *per se,* but becomes a deadly weapon if, in the manner of its use or intended use, it is *capable* of causing death or serious bodily injury. Tex. Penal Code Ann. § 1.07(a)(17)(B) (Vernon Supp.2007) (emphasis added); *McCain v. State,* 22 S.W.3d 497, 503 (Tex.Crim.App.2000). We must evaluate the capability of a weapon, in this case a pocket knife, to cause serious bodily injury or death in light of the facts surrounding the particular offense. *Thomas v. State,* 821 S.W.2d 616, 620 (Tex.Crim.App.1991); *Brown v. State,* 716 S.W.2d 939, 946–47 (Tex.Crim.App.1986). Factors to consider include the size, shape and sharpness of the knife; the manner of its use or intended use; the nature or existence of inflicted wounds; evidence of the knife's life-threatening capabilities; the physical proximity between the victim and the knife; and any words spoken by the

person using the knife. *Magana v. State*, 230 S.W.3d 411, 414 (Tex.App.–San Antonio 2007, pet. ref'd). In order to establish the knife was a deadly weapon, the State need not introduce the knife itself or a facsimile into evidence, and need not prove any wounds were actually inflicted or that "serious bodily injury" actually occurred. *Id.; Victor v. State*, 874 S.W.2d 748, 751–52 (Tex.App.–Houston [1st Dist.] 1994, pet. ref'd). Moreover, expert testimony that in the manner of its use the knife was capable of causing death or serious bodily injury is not required in order for the jury to find a deadly weapon was used. *Denham v. State*, 574 S.W.2d 129, 131 (Tex.Crim. App.1978).

Here, the evidence consisted of four photographs of wounds suffered by Justin Lerma, and the testimony of three witnesses: an eyewitness, Teresa Uribe; the victim, Lerma; and the responding officer, Odel Mendoza. Teresa Uribe testified that she saw the appellant Rivera holding a pocket knife immediately before he attacked her son-in-law, Lerma; she could not see the handle, but saw the reflection off of the knife blade. She then saw Rivera make the initial stab into Lerma with the pocket knife before Lerma got away and fled next door where he was pursued. Impeachment evidence was introduced consisting of a subsequent letter written by Uribe in which she states that she falsely accused Rivera; at trial, Uribe explained she did not want Rivera to take the blame for the fight, but that her trial testimony that Rivera stabbed Lerma with a pocket knife was true. This evidence went to Uribe's credibility with respect to the identity of the perpetrator, not the presence of a pocket knife and the manner of its use or intended use against Lerma.

The victim, Justin Lerma, testified that Rivera "stabbed me from the back and around my stomach," resulting in seven to eight wounds "around my back, around my stomach and on my arm." Lerma stated he did not see the weapon used, but that "it felt like a knife ... because it was going in like nothing." Lerma stated he was "trying to get away" and ran to another yard next door where Rivera chased him. After the attack, Lerma went to the hospital, where the wounds were cleaned and closed with "stickers that are like stitches;" he was released that same night. He also received medication for pain. Lerma testified that he could not return to work for approximately one month because he was "in a lot of pain" and needed a doctor's release. Finally, he testified that his back still hurts when it gets cold. On cross-examination, Lerma testified that he thought another guy, Oscar, also stabbed him once on his arm with a beer bottle during the fight.

Finally, Officer Mendoza testified that Lerma had "blatant injuries to his stomach," and Lerma told him he had been stabbed with "what appeared to be a knife." The officer testified he saw "several injuries," "some wounds to his stomach, to his back area, and to his rib area, all over ... on his abdomen and his back area." The officer described the wounds as "gaping." Specifically, Officer Mendoza identified State's Exhibit 2 as a photograph showing "a gaping hole," explaining, "so I knew it was some sort of aggravated assault with some sort of weapon, because he had a gaping wound on ... his stomach area...." Mendoza also described State's Exhibit 4 as showing a "gaping hole on the left side of the arm towards the back ... indicat[ing] to us, whoever attacked him, either attacked him from the back or while he was running away." The officer stated Lerma was treated at the scene, and subsequently went to the hospital for additional treatment. Mendoza testified that the officers found a "blood trail," but did not recover the knife. Officer Mendoza testi-

fied that he had investigated a few scenes where a knife was used to kill somebody, and stated that a knife "can be employed as a deadly weapon" depending on the manner of its use.

Considering Officer Mendoza's testimony that a knife is capable of causing serious bodily injury, *i.e.*, being used as a deadly weapon, his observation of a blood trail and several "gaping" wounds that required medical attention both at the scene and the hospital, and his characterization of the wounds as "indicative of an aggravated assault" involving a deadly weapon, as well as the other testimony that the pocket knife was used to stab Lerma multiple times, I cannot agree that the evidence is "so weak" as to render the jury's finding that Rivera used a deadly weapon "clearly wrong and manifestly unjust." *See Lancon v. State,* 253 S.W.3d 699, 704–05 (Tex.Crim.App.2008) (stating standard for factual sufficiency review). Even though the knife was not recovered, there was evidence about the type of knife, its sharpness, and the manner of its use, as well as the infliction of a number of "gaping" wounds, some of which were in the stomach area, that required medical attention; in addition, the officer stated that a knife can be a deadly weapon depending on the manner of use. *See Magana,* 230 S.W.3d at 414. I believe the evidence in this case supports a reasonable jury finding that the pocket knife was capable of inflicting serious bodily injury based on the manner of its use or intended use, and was therefore a deadly weapon. *See McCain,* 22 S.W.3d at 503 (object is "deadly weapon" if actor intends a use of the object in which it would be capable of causing death or serious bodily injury). Consequently, I would affirm the trial court's judgment.