# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00339-CR

---

**Thomas Albert Pearl, III, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
NO. CR-21-3972-A, THE HONORABLE DON R. BURGESS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Thomas Albert Pearl, III, was charged with aggravated assault with a deadly weapon (a knife) and with evading arrest with a previous conviction for that offense, and the indictment included enhancement allegations for the two offenses. *See* Tex. Penal Code §§ 12.42, .425, 22.01(a)(2), .02(a)(2), 38.04(a), (b)(1). Following a jury trial, the jury convicted Pearl of the two offenses, found the enhancement allegations true, and sentenced Pearl to forty years' imprisonment for the assault charge and to ten years' imprisonment for the charge of evading arrest. The trial court rendered its judgments of conviction consistent with the jury's verdicts. On appeal, Pearl contends that the evidence at trial was insufficient to support his conviction for aggravated assault. We will affirm the trial court's judgment of conviction for aggravated assault and leave undisturbed the conviction for evading arrest.

## BACKGROUND

On July 26, 2021, at approximately 8:00 p.m., the police responded to a 911 call concerning a dispute in an apartment complex parking lot in Hays County. The 911 caller resided at the complex and told the dispatcher that a man and a woman were having a fight in the parking lot of the complex, that the woman was angry, that the woman slapped the man, and that the woman threw rocks at the man and at the windshield of the man's car. The 911 caller indicated that the man was yelling but was not being physical, that he left the area before later returning to the woman, and that the man seemed sad and appeared to be crying. When the police arrived at the complex, they located the couple and talked with them. The woman was identified as Tara Harper, who resided at the complex and lived on the third floor of one of the buildings. The man was identified as Pearl, and he was Harper's boyfriend. After talking with the couple and after Pearl agreed to leave the apartment for the night, the police left the complex without arresting anyone.

Four days later, on July 30, 2021, at approximately 11:00 p.m., the same group of officers responded to another 911 call concerning Harper and Pearl. The 911 caller was a resident of the complex and told the dispatcher that a woman was screaming for help from a balcony in the complex, that she was trying to leave the apartment, that a man was doing something "shady," and that the man would not let the woman back inside the apartment from the balcony or let her leave the apartment. When the police arrived, they talked to residents who were outside and observed the dispute and then went to Harper's apartment. The police knocked on the door of the apartment and announced their presence as police officers dozens of times. When no response was made from inside the apartment, the police used a sledgehammer to force the door open. After the police entered the apartment, they found Harper inside the apartment and noticed that the balcony door was open. The police then heard residents exclaim that Pearl had left the apartment by jumping

2

off the balcony and running. Police officers then searched for and chased after Pearl before Pearl ultimately stopped running. The police talked with Harper and Pearl separately and arrested Pearl. Pearl was later charged with aggravated assault with a deadly weapon for assaulting Harper with a knife as well as evading arrest for the events that occurred on July 30.

During the trial, the State called the following witnesses: Harper, two police officers who responded to the apartment on July 26 and July 30, and one police detective who went to Harper's apartment over a year later to question her. During the witnesses' testimonies, the trial court admitted into evidence the 911 recordings from July 26 and July 30, photos of Pearl's and Harper's vehicles taken on July 26, photos of Harper and Pearl taken on July 30, photos of the inside and the outside of Harper's apartment taken on July 26 and July 30, and recordings from the body cameras of officers who responded to the apartment on July 26 and July 30.

**July 26 Incident**

As set out above, a resident from the apartment complex called 911 on July 26 to report that a woman later identified as Harper had slapped a man later identified as Pearl and thrown rocks at the man and his car. One of the responding officers testified that he did not observe any injuries on Pearl at the time but did notice some injuries on Harper that she claimed came from a recent car accident or were self-inflicted when she punched a mirror in her apartment. The officer related that both Harper and Pearl insisted that neither party physically touched the other during the dispute. The officer believed that Harper was the aggressor in that situation but testified that no one was arrested because neither party alleged that any physical violence occurred and because there was no evidence of a physical altercation. Although the officer concluded that Harper was intoxicated after smelling alcohol and told Harper that she could be arrested for public intoxication

3

if she went outside her apartment again, the officer also determined that Pearl was not intoxicated even though Harper insisted that Pearl had been drinking.

When inspecting the parking lot, the officer noticed that Pearl's windshield had been partially shattered, and Harper stated that maybe something fell on the windshield or that an accident occurred. While the officer talked with Harper, Harper admitted that she hid Pearl's car keys and cellphone, and the officer later testified that hiding someone's belongings can be a controlling behavior exhibited in domestic abuse. Further, the officer surmised that Harper had initiated this conflict and exercised power and control by throwing rocks at Pearl and taking and hiding his belongings. Moreover, the officer testified that although the officers and Harper were unable to locate Pearl's car keys, Pearl agreed to leave the scene anyway.

Footage from July 26 taken by the officer's body camera was admitted into evidence during Pearl's case in chief and showed Pearl opening Harper's apartment door to the police, agreeing to be temporarily handcuffed while the officers investigated, and telling the officers that the situation was under control but that Harper had gone "crazy." The officer noticed Harper outside, told her to wait at the bottom of the stairs, and went to talk with Harper after briefly talking with Pearl. Harper stated that both Pearl and she had been drinking, that Pearl told her that he was going to go to the movies with his daughter, that Harper took and hid Pearl's keys and cell phone in her car because she thought he was too drunk to drive, and that Pearl broke the windshield of her car by kicking it. Harper acknowledged that her hand was injured but stated that it happened when she punched a mirror in her apartment. Harper explained that neither Pearl nor she got physical with each other and that she did not want to press any charges. The officer told Harper that he did not want to arrest her for public intoxication even though she appeared intoxicated and that he did not want to arrest anyone that night, but the officer explained that either Pearl or she

4

would have to leave the apartment for the night. Harper looked for Pearl's belongings in her car and found his cellphone but not his keys. After Harper found the phone, Pearl agreed to leave the premises.

One of the other responding officers testified that he believed Pearl was the victim based on the information given to him. The officer acknowledged that although the 911 caller witnessed the slap, the witness did not see the entire incident. When discussing his interaction with Pearl, the officer recalled that Pearl spoke with the officers, did not attempt to flee, and had injuries on his neck that he stated were from a sexual encounter. The officer remembered placing handcuffs on Pearl but removing them quickly after determining that Pearl was not a threat.

The officer noticed that Harper's and Pearl's cars both had damaged windshields. The officer explained that no arrest was made that night because information was conflicting about who was at fault and because both parties denied having a physical encounter and damaging each other's car. The officer recalled that Harper stated that Pearl had been drinking and that she took his keys because she did not feel it was safe for him to drive, but the officer stated that he did not smell any alcohol on Pearl's breath that night. The officer testified that Harper yelled at people in the parking lot that night, that the officer thought Harper might try to fight one of those individuals, that he warned Harper that she could be arrested for public intoxication if she left the apartment again that night, and that Harper admitted to placing Pearl's belongings in her car. Further, the officer related that domestic abuse can involve controlling behaviors such as hiding keys and cellphones, but the officer explained that he did not think Harper was trying to exercise control over Pearl. The officer noticed that Pearl had injuries on July 26 and testified that another officer informed him that Harper had injuries that night. The officer related that Pearl agreed to leave the scene after Harper retrieved his phone from her car and informed the officers that he did not want

to press charges. The officer stated that his observations of the inside of Harper's apartment that night did not indicate that any incident occurred, and still shots from the footage from the officer's body camera taken on July 26 were admitted into evidence and documented how the inside of Harper's apartment was tidy and neat that night.[1]

When testifying about the incident on July 26, Harper stated that both Pearl and she were intoxicated that night, that Pearl broke her car's windshield, and that she broke his car's windshield in response. However, Harper denied physically abusing Pearl that night or touching him and denied throwing rocks at Pearl or his windshield.

**July 30 Incident**

As set out above, the same group of police officers responded to Harper's apartment on July 30 around 11:00 p.m. after a resident called 911 to report an incident of domestic abuse. One of the officers testified that when he responded to the 911 call and approached Harper's apartment, he noticed a bag and other personal belongings in the stairwell leading to the apartment. The officer remembered talking with witnesses in the parking lot who stated that they saw a man assaulting a woman on a balcony and heard the woman screaming for help and saying she was bleeding. The officer recalled that he tried to call Harper's cellphone multiple times but that Harper did not answer. The officer described how the group of responding officers loudly announced their presence and knocked on the door to Harper's apartment more than twelve times

---

[1] During the officer's cross-examination, footage from the officer's body camera was admitted into evidence and played for the jury. The exhibit was not initially made a part of the appellate record. When the clerk's office from this Court asked for the record to be supplemented to include the exhibit, the trial court clerk stated that the exhibit was unreadable and could not be played. In any event, the footage is from July 26, not the day of the alleged assault, and other footage from July 26 was admitted into evidence and submitted as part of the appellate record in this case.

before ultimately deciding to use a sledgehammer to force open the door. The officer stated that he saw Harper inside the apartment and that she appeared frantic. The officer mentioned how right after the officers entered the apartment, witnesses from the parking lot yelled that a man had jumped from the balcony and was running away. The officer and another responding officer ran after Pearl and ultimately caught up to him. When discussing his later interactions with Harper, the officer related that Harper would not discuss what happened and was not being cooperative.

Following the officer's testimony, footage from another officer's body camera taken on July 30 was admitted into evidence and played for the jury. The footage shows personal belongings, including a duffel bag, in the stairwell leading to Harper's third-floor apartment. The footage captures the officers knocking on the door, announcing their presence, and forcing the front door open. When the officers enter the apartment, Harper was crying, but Harper told the officers that nothing happened, that she tripped over a towel and fell, and that the blood on her face must have been from that fall. The footage showed that the apartment was in disarray with items knocked over and with items scattered on the floor throughout the apartment. Harper said her other injuries were from a car accident that she was involved in a few weeks earlier. Harper told the police that she did not want them to photograph her and turned away from the officers when they tried to take a photo with her in it. On the recording, Harper told the police that Pearl was intoxicated, that she tried to get him to go to bed, and that she took his keys to prevent him from drinking and driving. Harper stated that Pearl threw a "tantrum" and knocked things over and that she then kicked him out of her apartment and moved his belongings outside. The officers stated that Harper had scratches on her neck and noticed blood on an interior door. The officers also noticed a knife in a pink sheath on the kitchen island, and when asked about the knife,

7

Harper denied being threatened with a knife and claimed to have been using the knife earlier when cooking hamburgers.

The other testifying officer related how he talked with two witnesses in the parking lot on July 30, how he tried unsuccessfully to reach Harper on her cellphone, how the police breached the apartment, how he chased after Pearl after Pearl jumped from the balcony, and how he arrested Pearl for committing assault. The officer testified that Pearl had scratches on his face, back, neck, and chest and that some of those injuries could have been caused by a fingernail, but the officer explained that he did not know whether the injuries were caused by Pearl's jumping from the balcony and fleeing or by something else and that some of the injuries looked as if they were caused by a tree or brush. Further, the officer explained that Pearl stated that the injuries on his neck were from the July 26 incident. Photos of Pearl's injuries were admitted during the officer's testimony.

The officer testified that he did not think Harper was the aggressor on July 30, that the condition of the apartment and the blood in the apartment were consistent with her being assaulted, and that witnesses stated that Pearl assaulted Harper. The officer related that Harper's apartment on July 30 was in greater disarray and more consistent with an assault having occurred than it had been on July 26. Moreover, the officer stated that in relationships in which there is domestic abuse, the aggressor and victim can change roles during different events.

During the officer's testimony, footage from his body camera taken on July 30 was admitted into evidence and played for the jury. The recording captures the officers knocking on the door to Harper's apartment and announcing their presence. In addition, the footage shows the officer returning to the parking lot where one witness told the officer that he saw a man push a woman against the wall and where another witness told the officer that she saw a woman on a

balcony and heard her say "I'm bleeding," "he hit me," "you're drunk," and "get out" before the man pushed her. The officer returned to the apartment before the police decided to force the door open. The footage then shows the officer running downstairs after learning that Pearl had jumped off the balcony, looking for Pearl, running after him, ordering him to stop, and ultimately catching him and placing him under arrest. On the recording, Pearl told the officer that he did nothing wrong.

In her testimony addressing the July 30 incident, Harper stated that Pearl started drinking when they were away from the apartment and became upset when he realized that he had misplaced some money, but Harper said she was not drinking that day. Next, she recalled that she drove Pearl to a gas station because he said he wanted to purchase some more alcohol but that when they arrived at the gas station, Pearl started yelling at someone pumping gas and tried to fight the stranger. Harper related that she calmed Pearl drown, drove him to the apartment, and hid his keys because she did not want him to drive while he was drunk. According to Harper, Pearl became angry at her for hiding his keys, threatened to take her "down with [him,]" pulled her hair, picked her up by her pants and underwear, ripped her underwear with one hand, grabbed her by the throat, and squeezed her throat. Harper described the choking as lasting long enough that she thought she might die. Next, Harper recalled fighting back to defend herself, but she clarified that she did not injure Pearl. She remembered that Pearl grabbed a knife from the kitchen, that he removed the knife from the sheath, that he started chasing her around the apartment, that she went from room to room to avoid Pearl while he had the knife, and that Pearl threatened to slit her throat and push her out of an open window. Additionally, she testified that she went out on the balcony and began screaming for help and then hid in the bathroom. While in the bathroom, Harper noticed that she had blood on her face.

9

Further, Harper explained that when the police arrived, Pearl turned off all the lights to make it seem as though no one was home, and she tried to clean the blood off her face while in the bathroom. Harper recalled that when the police entered the apartment, she was wearing her hoodie that had been torn by Pearl's grabbing and choking her. Harper admitted that she did not tell the police what happened because she was scared and was trying to protect Pearl. Additionally, Harper related that she continued to be in a relationship with Pearl after the incident and tried to get the charges dropped at Pearl's request, but she stated that she ended the relationship in November 2021 while Pearl was still in jail. Harper testified that after she ended the relationship, she told the detective investigating the incident what really happened. During her testimony, photos were admitted into evidence that showed Harper with blood on her chin, her torn hoodie, and marks on the back of her neck. Harper explained that if she had cooperated with the police initially, they would have been able to take additional photos showing more of her injuries.

Next, the detective to whom Harper provided a statement testified that he went to Harper's apartment in September 2022 and described the apartment as neat and tidy. During the detective's testimony, photos of Harper's apartment taken on July 30 were admitted and published to the jury, and the photos showed blood on an interior door and items on the floors of the rooms in the apartment. The detective related that the condition of the apartment in September 2022 differed significantly from the photos taken on July 30. In addition to discussing the blood and items "strewn around" on the floor, the detective testified that there was a crack in one of the interior doors indicating that it had been forced open. The detective described the photos as being consistent with a disturbance having occurred in the apartment.

Additionally, the detective explained that the photos captured a knife in a pink sheath on Harper's kitchen island, and photos of the kitchen island taken on July 30 showing the

knife were admitted and published. In his testimony, the detective commented that the knife in the photos seemed out of place because no other similar items were out. The detective related that Harper showed him the knife during the interview, and he described the knife as having a six-to-eight-inch blade and as being capable of causing serious bodily injury or death even with a sheath on because the sheath could easily be removed. Further, the detective explained that based on his review of the body camera footage, Harper did not appear to be telling the truth when talking to the officers on July 30 and denying that anything occurred. But the detective explained that Harper seemed truthful when making her statement during the September 2022 interview. As support for this statement, the detective explained that he asked Harper to share her story without first showing her any footage from the body cameras to see if Harper's statement matched the footage, and the detective recalled that Harper's statement matched the footage. During his cross-examination, the detective admitted that he did not know for certain whether Harper normally kept her apartment orderly and did not know when the crack on the interior door occurred. Further, the detective conceded that "[g]iven [his] caseload, [he] did not do as many things" in the investigation as he "could have."

After considering the evidence, the jury found Pearl guilty of aggravated assault and evading arrest. Pearl appeals his conviction for aggravated assault.

**STANDARD OF REVIEW AND GOVERNING LAW**

In his issue on appeal, Pearl asserts that the evidence is insufficient to support his conviction for aggravated assault. When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Furthermore, reviewing courts "measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *See DeLay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014). The evidence is legally insufficient if "the

12

record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

Under the Penal Code, a person commits the offense of assault if he "intentionally or knowingly threatens another with imminent bodily injury." Tex. Penal Code § 22.01(a)(2). Further, an individual commits the offense of aggravated assault if he commits assault and "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b). "Intent can be inferred from the acts, words, and conduct of the accused." *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

The Penal Code contains a definition for items that are deadly weapons per se, including firearms and other items designed for the purpose of inflicting death or serious bodily injury, but also specifies that a deadly weapon can be "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ," and "'[b]odily injury' means physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8), (46).

"[N]ot all knives are manifestly designed, made, or adapted for the purpose of inflicting serious bodily injury or death." *Johnson v. State*, 509 S.W.3d 320, 322 (Tex. Crim. App.

2017). However, evidence will be sufficient to support that a knife is a deadly weapon "if the jury could have rationally found that [the defendant] used the knife in such a way, or intended to use the knife in such a way, that it was capable of causing serious bodily injury or death." *Id.* The State is not required to prove "that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). "The placement of the word 'capable' in the provision allows the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force." *Id.* However, the evidence must establish more than a hypothetical possibility that the object could cause death or serious bodily injury, and the assessment must be made "in light of the facts that actually existed when the felony was committed." *Johnston v. State*, 115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd*, 145 S.W.3d 215 (Tex. Crim. App. 2004).

Although "the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used," *Tucker v. State*, 274 S.W.3d 688, 691-92 (Tex. Crim. App. 2008), a defendant need not have actually inflicted harm on the victim for a weapon to be a deadly one through its use or intended manner of use, *Johnson*, 509 S.W.3d at 322. In deciding whether a weapon is a deadly one through its use or intended use, appellate courts "consider words and other threatening actions by the defendant, including the defendant's proximity to the victim; the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon; and the manner in which the defendant used the weapon." *Id.* Additionally, courts may consider testimony by the victim explaining that victim "feared death or serious bodily injury" and testimony regarding "the weapon's potential for causing death or serious bodily injury." *Romero v. State*, 331 S.W.3d 82, 83 (Tex. App.—Houston [14th Dist.] 2010, pet.

ref'd).  No factor is determinative, and each case must be examined on its own facts.  *Nash v. State*, 175 S.W.3d 427, 430 (Tex. App.—Texarkana 2005, pet. ref'd).  Additionally, "[e]xpert testimony is not required" to prove that an object is a deadly weapon.  *See Rivera v. State*, 271 S.W.3d 301, 304 (Tex. App.—San Antonio 2008, no pet.).

It "is not necessary" to admit the knife or provide a detailed description of the knife "when there is other evidence showing the knife was capable of inflicting serious bodily injury in the manner in which it was used."  *Serna v. State*, No. 01-89-00168-CR, 1989 WL 141214, at \*3 (Tex. App.—Houston [1st Dist.] Nov. 22, 1989, pet. ref'd) (op., not designated for publication); *see Villarreal v. State*, 809 S.W.2d 295, 297 (Tex. App.—Corpus Christi-Edinburg 1991, pet. ref'd) ("Although the knife was not introduced into evidence, and no detailed description of the knife was made, appellant's manner of use of the knife and his threats to kill the victims provide sufficient evidence from which a rational trier of fact could have found that the knife was a deadly weapon").  "When no actual injury is sustained by the victim, the prosecution must introduce evidence of other factors to establish that the knife is a deadly weapon."  *Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref'd).

## DISCUSSION

When challenging the sufficiency of the evidence, Pearl contends that the State's case rested on circumstantial evidence except for Harper's "awakened keystone testimony that she was assaulted by Pearl with a knife."  Although Pearl acknowledges that there was evidence of a disturbance on July 30, he contends that the photos and videos of the scene did not establish who was at fault and did not establish that a knife was involved.  Moreover, Pearl argues that Harper's testimony regarding the assault was not credible.  As support, Pearl highlights that Harper did not

15

tell the police about the alleged assault until over a year after the incident, that Harper continued to be in a relationship with him after his arrest, and that the detective mentioned that Harper did not appear to be telling the truth to the police on July 30.[2]  Further, Pearl emphasizes that four days before the alleged incident, the police were called to the apartment complex after a witness reported seeing Harper being the aggressor and assaulting Pearl.

When attacking Harper's credibility, Pearl also contends that Harper's testimony at trial indicated that she did not remember details from the July 26 incident, did not disclose information to the police, did not recall when she disclosed the knife incident to the police and the prosecutor's office, and seemed confused about the date of the July 30 incident because she testified that it occurred on July 28 or 29.  Pearl also alleges that the police failed to conduct a proper investigation in this case and, as support, notes that the officers who responded to the scene on July 30 did not obtain witness statements from the individuals in the parking lot, highlights that those witnesses did not testify at trial, mentions that no evidence established that the blood seen on Harper's face was from a knife wound, emphasizes that the knife allegedly used in the incident was never collected by the police or admitted into evidence, and points to the detective's testimony in which the detective conceded that he could have done a more thorough investigation in this

---

[2] In this issue, Pearl also asserts that the State called the detective, in part, to establish that Harper was being deceptive on July 30 to undermine the effect of her statement that nothing happened on the day in question and contends that it was improper for the detective to testify about whether Harper was telling the truth.  Although Pearl initially objected before the State was about to ask the detective about whether Harper was being truthful, he withdrew the objection by stating "[t]hat's fine" after the State explained what questions it planned to ask and, accordingly, no ruling was made on the objection.  *See* Tex. R. App. P. 33.1(a) (setting out requirements for preserving complaint for appellate consideration).  In any event, sufficiency reviews consider the evidence that was admitted regardless of whether it was rightly or wrongly admitted.  *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020).

16

case.  For these reasons, Pearl contends that the evidence was insufficient to support his conviction for aggravated assault.

As an initial matter, we note that to the extent that Pearl is suggesting that the evidence was insufficient because it did not establish that Harper was cut by the knife in question, the State was not obligated to prove in this case that Pearl used the knife and caused bodily injury and was instead required to prove that Pearl intentionally or knowingly threatened to cause Harper bodily harm while using or exhibiting a deadly weapon.  *See* Tex. Penal Code §§ 22.01(a)(2), .02(a)(2).  Similarly, in so far as Pearl is suggesting that the evidence could not be sufficient because the knife was not admitted into evidence, the State was not required to move to admit the knife if other evidence was presented establishing that the knife was a deadly weapon.  *See Serna*, 1989 WL 141214, at \*3; *see Villarreal*, 809 S.W.2d at 297.  Moreover, to the degree that Pearl is faulting the investigation performed by the police, an appellate court's role in conducting a sufficiency review is not to consider what additional evidence might have been gathered through a more thorough investigation but to consider the evidence that *was* presented at trial and decide whether that evidence was sufficient to support the conviction.  *See McDonald v. State*, No. 02-17-00264-CR, 2018 WL 5289358, at \*5 (Tex. App.—Fort Worth Oct. 25, 2018, pet. ref'd) (mem. op., not designated for publication).

Further, we note that most of Pearl's sufficiency challenges rest on assertions that Harper's testimony regarding the alleged assault should not be credited because it was contradicted by statements she made before trial and because, according to him, it was inconsistent with Harper's actions after the incident; however, credibility determinations and decisions about what weight to provide the evidence presented at trial are determinations that lie within the purview of the jury, *Stahmann*, 602 S.W.3d at 577, and we resolve any inconsistency in the evidence in favor

17

of the jury's verdict, *Merritt*, 368 S.W.3d at 525-26.  For example, the jury could have reasonably credited Harper's testimony that she did not disclose the assault to the police on July 30 because she was scared and was trying to protect Pearl and that she tried to get the charges dismissed because he asked her to.  *See McDonald*, 2018 WL 5289358, at *2, *3, *5 (noting in opinion that officer testified that victims can try to protect their abusers by claiming that no abuse occurred, that defendant encouraged victim to get charges dropped, and that victim explained at trial why she changed her story).

Additionally, although evidence was presented indicating that Harper was the aggressor on July 26, evidence was presented showing that Pearl was the aggressor on July 30.  In resolving this conflict, the jury could have reasonably relied on the testimony of one of the officer's explaining that in relationships involving domestic abuse, the roles of victim and aggressor can switch for different incidents.  Similarly, although photos and footage from the officers' body cameras showed that Pearl had injuries on various parts of his body on July 30 that appeared fresh, the officer who saw the injuries testified that he was unsure what caused the injuries and explained that one of the potential causes could have been Pearl's having jumped from a third-story balcony and scraping himself on a tree, and no witness specifically testified that the injuries were caused by Harper.  Even though Pearl points out that Harper had trouble answering some questions at trial because she could not remember, "[t]he jury was free to evaluate the sufficiency of [her] memory regarding the details of the" assault.  *See Williams v. State*, No. 14-07-00192-CR, 2008 WL 2573779, at *3 (Tex. App.—Houston [14th Dist.] June 26, 2008, no pet.) (mem. op., not designated for publication); *see also Lovings v. State*, 376 S.W.3d 328, 336 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (noting that rational jury could conclude that it might be normal for assault victim to remember what happened "yet be unable to recall every detail").

When viewing the evidence in the light most favorable to the conviction, the evidence presented at trial demonstrated that a resident called 911 on July 30 to report that a woman was screaming for help from a balcony and that a man would not let the woman back inside or let her leave the apartment. Moreover, footage from one of the officer's body cameras taken before the police entered the apartment on July 30 documented two witnesses telling the officer that they saw a man shove a woman and that the woman screamed from the balcony that the man hit her and that she was bleeding. Further, when the officers went inside the apartment on July 30, they noticed that the condition of the apartment was consistent with an assault having happened because items were scattered on the floors of the rooms of the apartment, one of the interior doors had blood on it, and one interior door was cracked, possibly indicating that someone had tried to force the door open. Moreover, the responding officers and the investigating detective testified that the apartment's condition on July 30 differed from the orderly condition seen on July 26 and more than a year after the incident. The police also observed a knife on the kitchen island that seemed out of place. Additionally, the officers found Harper in the apartment with blood on her face and scratches on her neck and wearing a ripped hoodie.

Moreover, Harper testified that Pearl became angry on July 30 after misplacing his money, that he was intoxicated, and that he tried to fight a stranger at a gas station. Further, she related that Pearl became enraged after she hid his keys when they returned to her apartment in an effort to prevent him from driving while intoxicated, threatened to take her "down with [him]," pulled her hair, picked her up by her pants and underwear, and grabbed her by the throat with one hand and squeezed it for a period long enough to make her believe that she could die. *See Patrick*, 906 S.W.2d at 487 (noting that defendant's intent can be inferred from his acts, words, and

19

conduct); *see also Marshall v. State*, 479 S.W.3d 840, 844 (Tex. Crim. App. 2016) (explaining "that any impediment to normal breathing is a bodily injury").

Next, Harper testified that Pearl grabbed a knife from the kitchen and threatened to slit her throat and push her out one of the apartment's windows, causing her to flee from him and move from room to room to avoid him and causing her to go out on the balcony and scream for help. *See Ortiz v. State*, 993 S.W.2d 892, 894, 896 (Tex. App.—Fort Worth 1999, no pet.) (determining that evidence was sufficient to show defendant used deadly weapon in part because it established that defendant made multiple threats to kill victim); *see also Pavatt v. State*, No. 05-20-00070-CR, 2021 WL 1904323, at *3 (Tex. App.—Dallas May 12, 2021, no pet.) (mem. op., not designated for publication) (concluding that evidence was sufficient to establish that defendant threatened victim with deadly weapon in case in which victim sustained no injury where officer testified that knife was capable of causing serious bodily injury or death, where defendant threatened to stab victim, and where defendant was prevented from stabbing victim through measures to restrain defendant); *Hernandez v. State*, 649 S.W.2d 720, 722 (Tex. App.—Amarillo 1983, no pet.) (concluding that evidence was sufficient to convict defendant of aggravated assault with deadly weapon where he placed knife with eight-inch blade against victim's throat and announced his intention to cut her if she cried out).

Moreover, the detective investigating this case testified that the knife had a six-to-eight-inch blade and that it was capable of causing death or serious bodily injury. *See Denham v. State*, 574 S.W.2d 129, 131 (Tex. Crim. App. 1978) (reasoning that description of knife as one with seven- or eight-inch blade and testimony concerning defendant's intended use for knife was sufficient to allow jury to determine that knife was deadly weapon); *Hernandez*, 649 S.W.2d at 722 (explaining that "[a]n eight inch sharp pointed blade is patently capable of causing the necessary

harm" to be considered deadly weapon). Furthermore, Harper testified that Pearl turned off the lights in the apartment to make it look like no one was home when the police arrived, and the testimony of the responding officers and body-camera footage showed that Pearl did not open the door to the police and fled the scene when the police broke the door down. *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (noting that inference of guilt may be drawn from flight). This behavior differed significantly from Pearl's behavior on July 26.

Given our standard of review and considering the reasonable inferences that the jury could have made from this evidence, *see Eustis*, 191 S.W.3d at 884, we conclude that the jury could have reasonably inferred that Pearl intentionally or knowingly threatened Harper with imminent bodily injury while using or exhibiting a knife and that the knife was a deadly weapon, *see* Tex. Penal Code §§ 22.01(a)(2), .02(a)(2). Accordingly, we overrule Pearl's issue on appeal.

## CONCLUSION

Having overruled Pearl's issue on appeal, we affirm the trial court's judgment of conviction for aggravated assault and leave undisturbed the trial court's judgment of conviction for evading arrest.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Theofanis

Affirmed

Filed: November 1, 2024

Do Not Publish

21