**Sammie Luckus COOK, Jr., Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–01–00386–CR.**

Court of Appeals of Texas, Eastland.

Feb. 6, 2003.

Allan Fishburn, Jim Hamlin, District Clerk–Dallas County–Criminal Section, Dallas, for appellant.

Bill Hill, Criminal District Attorney–Appellate Section, Sheriff, Dallas County Detention Services, Dallas, for appellee.

Panel consists of ARNOT, C.J., and

WRIGHT, J., and DICKENSON, S.J.*

## Opinion

BOB DICKENSON, Senior Justice (Retired).

The jury convicted Sammie Luckus Cook, Jr. of aggravated sexual assault. The jury also found that appellant used a deadly weapon during the commission of the offense and assessed his punishment at confinement for life and a fine of $10,000. We affirm.

### Points of Error

Appellant presents seven points of error. First, appellant argues that the trial court erred: (Point 1) by failing to define "reasonable doubt" in its charge to the jury; and (Point 2) by denying his motion for continuance. Next, appellant argues: (Point 3) that the evidence was "legally insufficient" to prove that the knife was a deadly weapon; (Point 4) that the evidence was "factually insufficient" to prove that the knife was a deadly weapon; and (Point 5) that the evidence was "factually insufficient" to prove identity. Finally, appellant argues that the trial court erred: (Point 6) by instructing the jury that "intent may be inferred from acts done, words spoken, or both"; and (Point 7) by failing to make a proper determination on the admissibility of extraneous offense evidence at the punishment phase of trial.

### The Indictment

The indictment charged that, on or about April 13, 2000, appellant unlawfully caused the penetration of the female sexual organ, anus, and mouth of Virginia Smith (pseudonym). The indictment also charged two prior felony convictions.

### Proof of Indictment

The first witness was Virginia Smith. That was not her true name, but she testified that it was the name which she wanted to go by for this trial. At the time of the offense, Virginia Smith lived in an apartment complex in Dallas. Virginia Smith testified that April 13, 2000, was a day that she will never forget. She got to her apartment about 5:30 p.m., changed clothes, and went to check the mail. When she got back to the apartment, she opened the patio door and started cleaning the kitchen. While she was putting up the dishes, she heard a noise from the patio. Then she saw a man standing in her living room. She made a positive identification of appellant as the man who came into her apartment and assaulted her.

Virginia Smith said that she asked appellant what he wanted and that he kept telling her to "shut up." Virginia Smith testified that appellant grabbed her by her arm and pulled her into her bedroom. Then he took her into the bathroom. Appellant closed the bathroom door, and Virginia Smith could hear him in the kitchen going through the drawers. When he came back to the bathroom, appellant had Virginia Smith's purse and a knife. He told her to give him all the money that she had. Virginia Smith said that appellant had the only sharp knife which she had in the apartment. After he took all the money from her purse, appellant told Virginia Smith to get undressed. Virginia Smith started crying, and appellant poked her with the knife until she complied with his demand. Virginia Smith identified the pictures which showed the way she looked when the police came to her apartment later that night.

* Bob Dickenson, Retired Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

The first sexual assault was in the bathroom when appellant forced Virginia Smith to put his penis in her mouth. Appellant told her not to bite him, and he said that he would kill her if she bit him. He put the knife to her throat.

The second sexual assault alleged in the indictment occurred when appellant got on top of Virginia Smith in the bedroom and penetrated her vagina with his penis. He had been poking her with the knife, and he rubbed the knife against her after he got on top of her. Virginia Smith said that she could smell alcohol while appellant was on top of her. Virginia Smith said that appellant told her that he would kill her if she told anyone what happened or if she called the police. Virginia Smith said that appellant told her that he would always be able to find her and that she would not be able to hide. Then he tried to kiss her, and he got mad when she would not return the kiss.

The third sexual assault charged in the indictment was when appellant told Virginia Smith to turn over and lie on her stomach. Appellant asked for Vaseline or lotion and then told her that it was her fault if it hurt and that she had better not scream. Appellant was running the knife down Virginia Smith's back, side, and arm. Some of the exhibits showed the cuts he made. Virginia Smith said that appellant made penetration of her anus with his penis and that it hurt.

There was a fourth sexual assault. Appellant laid on the bed on his back and made Virginia Smith get on top of him. Appellant still had the knife, and he was poking her until she did what he wanted. Virginia Smith said that she "just wanted it to be over with." Appellant was calling her names, and his penis penetrated her vagina.

Appellant then put Virginia Smith back into the bathroom and told her to stay there. Virginia Smith waited 10 or 15 minutes to make sure that he was gone. Then she got dressed and ran to her friend's apartment in the next building. The friend was not there, but the friend's mother and daughter let Virginia Smith into their apartment. They called "9–1–1" for her, and the police came to her apartment.

There was also testimony by several police officers. That testimony documented the crime scene, the chain of custody of items found at the scene, and pictures which were made of Virginia Smith and of her apartment on the night of the offense. One of the officers also testified that, at a later date, Virginia Smith picked appellant's picture from a photographic array. There was also expert witness testimony for both the State and the defense.

The State's expert witness was Tim Kalafut, Ph.D. He testified that he was employed by Southwestern Institute of Forensic Sciences (SWIFS) as a forensic biologist, and he explained "DNA" profiling and "STR" analysis for the jury. DNA is the acronym for "deoxyribonucleic acid." STR is the acronym for "short tandem repeat." Dr. Kalafut explained that DNA is "packaged" in chromosomes and that each person has 23 pairs of chromosomes. These are the "blueprints" for the body, and they determine everything about a person. Half of each pair comes from the person's mother, and the other half comes from the person's father. Dr. Kalafut said that we have "little repeating units" of DNA which are measured by the STR. DNA can be used for many purposes, and one of those purposes is for the identification of the person who has a particular DNA. Dr. Kalafut said that statistical calculations can be generated to show the strength of the match and that STR analysis is "currently the state-of-the-art

DNA testing, worldwide." Dr. Kalafut testified that DNA from sperm cells on clothing sent to SWIFS from Virginia Smith's apartment was a positive match with DNA taken from appellant. Dr. Kalafut said that the sperm cells from Virginia Smith's clothing were "a match," that they were "identical," and that they were "the same DNA profile."

Dr. Kalafut's report was admitted into evidence, and it shows that the "probability of selecting at random" an unrelated African–American individual with the same DNA as that found on Virginia Smith's clothing was "one in 301 billion." Dr. Kalafut then said that the total population of the entire earth was "around six-and-a-half billion people."

After the State rested, appellant's trial counsel called Amber Moss as the only witness for the defense. Moss testified that she is a forensic scientist who is employed by Genescreen and that Genescreen is a DNA laboratory. Moss was critical of the protocol used by SWIFS. Moss said that SWIFS used readings below the standard suggested by the manufacturer of the machine. Moss said that her DNA tests did not show a match for appellant, that she tested samples which were given to her by SWIFS, that she used the same kind of kit and machine that SWIFS used, and that she did not use readings below the standard suggested by the manufacturer. During cross-examination, Moss agreed that the manual for the machine which both she and SWIFS used contained the statement: "Peak heights less than 150 RFU *should be interpreted with caution.*" (Emphasis added) She also agreed that the manual does not say that 150 RFU is the minimum and that it does not say that 150 RFU or more is mandated. When she was asked to review the report from Dr. Kalafut, she agreed that it showed above 150 RFU on the tests which he made in this case. Moss agreed that, if she had gotten the same results as Dr. Kalafut, she would have said that it was a "good match."

### Proof at Punishment Phase

Six other victims of aggravated sexual assaults testified at the punishment phase of trial. There was DNA evidence from each of those assaults which matched the DNA evidence from appellant. These witnesses will be identified by the pseudonyms which they used during trial or by initials.

"Amy Harrison" testified about events on February 15, 1995, when she was subjected to two acts of aggravated sexual assault by an unknown man. The police took her to Parkland Hospital for the rape kit examination. "Mary Smith" testified about events on December 18, 1995, when she was subjected to an aggravated sexual assault by an unknown man. The police took her to Parkland Hospital for the rape kit examination. M.C.R. testified through an interpreter about the events on March 28, 1996, when she was subjected to an aggravated sexual assault by an unknown intruder (in the presence of her five-year-old daughter). The police took her to the hospital for an examination. "Joanna Smith" testified about events on May 7, 1996, when she was subjected to a series of aggravated sexual assaults by an unknown intruder. The police took her to Parkland Hospital for the rape kit examination. "Beth Smith" testified about the events on May 19, 1996, when she was subjected to a series of aggravated sexual assaults by an unknown intruder. The police took her to the hospital for a rape kit examination.

"Mary Becker" testified about the events on May 6, 2000. These events occurred 23 days after the offense for which appellant was convicted. After he committed several acts of aggravated sexual assault, appellant fell asleep in Mary Beck-

er's apartment. Appellant was arrested after she was able to escape and call the police. The police took her to the hospital for the rape kit examination. The police detective put appellant's photograph into the photographic lineup which he showed to Virginia Smith.

There was testimony by the police officers who arrested appellant at Mary Becker's apartment, and there was testimony by Dr. Kalafut that DNA evidence from the sexual assaults of all six witnesses matched appellant's DNA evidence.

## Definition of "Reasonable Doubt"

■ Appellant argues in his first point that the trial court erred in failing to define "reasonable doubt" in its charge to the jury. See *Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Cr.App.2000), where the court specifically overruled that portion of *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App. 1991), which required the trial courts to instruct juries on the definition of "beyond a reasonable doubt." The court also said in *Paulson v. State*, supra at 573:

It is ill-advised for us to require trial courts to provide the jury with a redundant, confusing, and logically-flawed definition when the Constitution does not require it, no Texas statute mandates it, and over a hundred years of pre-*Geesa* Texas precedent discourages it.

■ Appellant argues that *Paulson v. State*, supra, should not apply to the trial of his case because the offense for which he was indicted occurred before the date of the opinion in that case. We disagree. The procedural change in *Paulson v. State*, supra, applies to all trials subsequent to the opinion in that case. See *Taylor v. State*, 10 S.W.3d 673, 683 (Tex.Cr.App. 2000). Point of Error No. 1 is overruled.

## Denial of Continuance

■ Appellant argues in his second point that the trial court erred by overruling his motion for continuance. The trial of this case began on September 10, 2001, and the World Trade Center was bombed on September 11. One of appellant's witnesses was unable to fly from El Paso to Dallas to attend trial and testify. That witness would have testified as an expert witness "about issues such as stress ... and how it affects the complainant's ability to perceive her attacker." Appellant moved for continuance pursuant to TEX. CODE CRIM. PRO. ANN. art. 29.06 (Vernon 1989) on the basis that "identity is the only contested issue." Appellant has not shown an abuse of discretion by the trial court in overruling his motion for continuance. The record does not show the "facts which are expected to be proved by the witness" or that the "facts set forth in said motion were probably true." There was not only eyewitness identification of appellant, but there was also DNA evidence which identified appellant beyond any reasonable doubt. This record does not show that appellant "was actually prejudiced by the denial of his motion." See *Janecka v. State*, 937 S.W.2d 456, 468 (Tex.Cr.App. 1996), *cert. den'd*, 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997). Point of Error No. 2 is overruled.

## Sufficiency of Evidence

■ Appellant's claim under Point of Error No. 3 that the evidence was "legally insufficient" to prove that the knife was a deadly weapon has been reviewed under the test stated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Appellant's claims under Points of Error Nos. 4 and 5 that the evidence was "factually insufficient" to prove that the knife was a deadly weapon and to prove the "element of identity"

(that appellant was the man who committed the offense) have been reviewed under the tests stated in *Johnson v. State*, 23 S.W.3d 1, 6 (Tex.Cr.App.2000), and *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Cr.App. 1996). We hold that the evidence summarized above was both "legally sufficient" and "factually sufficient" to prove that the knife was a deadly weapon[1] and that the evidence was "factually sufficient" to prove the element of identity. Points of Error Nos. 3, 4, and 5 are overruled.

### Jury Instruction on "Intent"

■ Appellant argues in his next point that the trial court erred by instructing the jury that: "Intent may be inferred from acts done, words spoken or both." There was no objection to this instruction. Since there was no timely objection to the charge, appellant must show "egregious harm." *Ellison v. State*, 86 S.W.3d 226 (Tex.Cr.App.2002); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1985). The instruction was a correct statement of the law. See *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Cr.App.1982). Appellant's defense was not based upon the lack of intent; it was based upon his argument that someone else had committed the assault. Appellant has not shown "egregious harm" from the instruction to the jury that intent could be "inferred" from acts done, words spoken, or both. Point of Error No. 6 is overruled.

### Extraneous Offenses

■ Appellant argues in his last point that the trial court erred by failing to make a "proper preliminary determination" on the admissibility of extraneous offense evidence at the punishment phase of trial. The record shows that, before

"Amy Harrison" (the first extraneous offense witness) testified, appellant's trial counsel asked to approach the bench. The record shows that an off-the-record discussion was held at the bench. The record also shows that, after "Mary Smith" (the second extraneous offense witness) testified, appellant's trial counsel stated in open court outside the presence of the jury:

> For the record, before the first witness was called this morning, I approached the bench and made an objection to the introduction of these extraneous offenses regarding the rape; that they hadn't been proved beyond a reasonable doubt. The Court gave me a running objection.

The court did make a preliminary determination on the admissibility of the extraneous offense evidence. The evidence which was summarized above supports the trial court's ruling. See TEX. CODE CRIM. PRO. ANN. art. 37.07, § 3(a)(1) (Vernon Supp.2003) which authorizes the trial court to admit "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant." The DNA evidence by Dr. Kalafut was sufficient to support the trial court's preliminary ruling on the admissibility of this evidence. During the punishment phase of trial, the court instructed the jury that:

> You are instructed that if there is testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment in this case, *you cannot consider said testimony for the purpose of assessing punishment, unless you find and believe beyond a reasonable doubt that the*

---

1. TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (Vernon 1994) defines a "deadly weapon" as including "anything that in the manner of its use ... is capable of causing death or serious bodily injury."

*defendant committed such offenses.* (Emphasis added)

The evidence before the jury, including the DNA testimony and proof of appellant's arrest while he was in the bed of "Mary Becker" (the last extraneous offense witness), was sufficient to support the jury's belief beyond a reasonable doubt that he had committed each of those offenses and to consider those offenses for the purpose of assessing punishment. Point of Error No. 7 is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.