# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00631-CR

### Salvador Sanchez, Appellant

### v.

### The State of Texas, Appellee

---

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. CR-19-2335-E, THE HONORABLE SHERRI TIBBE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Salvador Sanchez was charged with the offense of aggravated kidnapping. *See* Tex. Penal Code § 20.04. The indictment alleged that Sanchez used a deadly weapon (a knife) during the offense and further alleged that prior to committing the offense in question, he had previously been convicted of the felony offense of burglary.[1] *See id.* §§ 1.07(a)(17), 12.42, 30.02. A jury convicted Sanchez and assessed his punishment at twenty-eight years' imprisonment, *see id.* § 12.32, and the trial court rendered its judgment of conviction consistent with the jury's verdict. On appeal, Sanchez contends that the evidence was insufficient to support the deadly weapon finding. We will affirm the trial court's judgment of conviction.

---

[1] The indictment originally contained additional counts for aggravated assault and unlawful restraint stemming from the same incident, but the State moved to dismiss those counts. *See* Tex. Penal Code §§ 20.02, 22.02. The indictment also included a second enhancement allegation regarding another prior offense, but the State abandoned that enhancement at the start of trial.

## BACKGROUND

On the evening of September 23, 2019, Sanchez called 911 multiple times to report that his life was in danger. Shortly after Sanchez began making the calls, Ronnie Newman also called 911 from the San Marcos bus station and reported that there was a man across the hall in the Greyhound office who kept saying that his life was in danger and refused to leave the office. When two officers arrived at the station, an individual who was outside told the officers that there was a man with a knife in the station. The police drew their weapons as they entered the station, saw a man holding a knife while also holding a man by the neck, told the man with the knife to drop it, and directed the other man to leave the office. The police learned that the man with the knife was Sanchez and that the other man was Thomas Hernandez who worked for Greyhound. Once Hernandez left the office, the officers handcuffed Sanchez, arrested him, and transported him to jail. One officer followed Hernandez as he was transported by ambulance to a nearby hospital for treatment of knife wounds that he sustained in the incident.

After securing Sanchez, the officers talked with Newman and Hyman Arredondo, who worked with Newman and was also in the station at the time of the incident. During their investigation, the police found in the Greyhound office the knife used in the incident and obtained surveillance footage from inside the station, footage taken by an individual who was outside the station filming the incident with a cellphone, and recordings of the 911 calls made by Sanchez and Newman. Sanchez was later charged with aggravated kidnapping, and the indictment alleged that he used a deadly weapon (a knife) during the commission of the offense. During the trial, the following witnesses testified: Newman, Arredondo, and police officers who either responded to the scene or were involved in the investigation. Additionally, the following exhibits were admitted: footage of the incident captured by cameras inside the station, by the body camera of one of the

2

responding officers, and by the cellphone of an individual outside the station; recordings of the 911 calls; photos of the scene and injuries sustained by Hernandez; and the knife discovered in the office.

The surveillance footage from multiple cameras captured the following events:

- Sanchez talking on his cellphone inside the station while walking toward the Greyhound office;

- Sanchez opening the office door with a sign that read "Authorized Personnel Only" and entering the office;

- Hernandez telling Sanchez to leave the office, and Arredondo and Newman similarly telling Sanchez to leave from across the hall;

- Newman stating that he was going to call the police before picking up the phone and making a call;

- Sanchez stating repeatedly that his life was in danger, yelling at his mother on his cellphone, telling her to call someone to help him, asking Hernandez to call the police, using the office phone to make another phone call, and reporting on the call that someone was trying to kill him;

- Sanchez pulling out a knife, placing the knife to his own throat, and threatening to kill himself;

- Hernandez telling Sanchez not to hurt himself and to put the knife down;

- Hernandez stating that he was trying to help Sanchez;

- Sanchez advancing toward Hernandez who was attempting to back up and get away;

- Sanchez grabbing Hernandez from behind by placing one of his arms around Hernandez's neck and using his other hand to hold the knife near Hernandez's throat and face;

- Arredondo and Newman rushing to the Greyhound office from across the hall to help and telling Sanchez to let Hernandez go;

- Sanchez ordering Arredondo and Newman to get back repeatedly while holding the knife near Hernandez's neck and face;

3

- Arredondo and Newman backing out of the office;

- Sanchez pulling Hernandez closer to the ground while Hernandez struggled to get free;

- Two police officers entering the station with their guns drawn and ordering Sanchez to lower the weapon;

- Sanchez dropping the weapon, releasing Hernandez, and asking the police why they did not respond sooner;

- Hernandez standing up, kicking the knife away, and leaving the office; and

- The police officers taking Sanchez into custody.

Arredondo provided testimony consistent with the surveillance footage and explained that Sanchez grabbed Hernandez "around the neck in a choke-hold type manner" and held a knife to Hernandez's throat, that Sanchez was "[a]ggressive" and "physically violent," that Hernandez never threatened Sanchez or made any threatening gestures, and that there did not appear to be anyone in the area threatening Sanchez. Arredondo described the knife as having a four-to-five-inch blade and related that Hernandez suffered injuries to his face and neck during the incident. On cross-examination, Arredondo admitted that he did not know if the injuries were life-threatening.

Newman testified that he called the police when he noticed Sanchez appearing agitated and entering a restricted area. Further, Newman recalled that he ran to help Hernandez when Sanchez grabbed Hernandez, that Hernandez begged Sanchez not to hurt him, that Sanchez had his arm around Hernandez, that Sanchez was holding a knife, that Sanchez made "a stabbing-type motion" with the knife, and that Hernandez tried to keep the knife away from his face. Newman recalled that he left the area near the Greyhound office after Sanchez ordered him to back up and threatened to stab Hernandez. Additionally, Newman stated that he evaluated Hernandez's

injuries after the police arrived, that Sanchez had stabbed Hernandez on the cheek, and that the knife "went all the way through and it pierced [Hernandez]'s tongue."

One of the responding officers testified that she believed that Sanchez was under the influence of some type of drug at the time of the incident due to his high level of paranoia, and she explained that there was no threat to Sanchez when she arrived. Further, she testified that the police found the knife on the floor and saw blood drops on the floor. During her testimony, footage from her body camera was played and captured Sanchez stating that he "didn't want to hurt that old man," that he "just used him as a shield," and that Hernandez hurt himself when he grabbed the knife. In her cross-examination, the officer stated that she did not hear Sanchez threaten to kill Hernandez and that nothing in her investigation revealed any statement by Sanchez threatening to kill Hernandez; however, she also explained that some threats can be accomplished physically. The officer recalled that Sanchez immediately complied with the police officers' directive to release Hernandez and that he did not resist being arrested.

Another officer testified that she followed Hernandez as he was taken to the hospital for treatment of his injuries. Regarding the injuries, the officer recalled that Hernandez's cheek was bleeding and that the wound was approximately one to one-and-a-half inches long. In her cross-examination, the officer explained that the injury did not appear to be life threatening and that the treating physician described the cheek wound as "superficial"; however, she clarified that the wound did end up needing stitches. During the officer's testimony, photos of Hernandez's face were admitted into evidence and showed a fresh wound on his cheek that was bleeding.

After considering the evidence presented during the guilt-innocence phase, the jury found Sanchez guilty of aggravated kidnapping and found that he used a deadly weapon (a knife)

5

during the offense. Following the punishment phase, the jury assessed his sentence at twenty-eight years' imprisonment.

Sanchez appeals the trial court's judgment of conviction.

## STANDARD OF REVIEW

In his issue on appeal, Sanchez contends that the evidence was insufficient to support the deadly weapon finding. When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate

6

courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

## DISCUSSION

In challenging the sufficiency of the evidence supporting the deadly weapon finding, Sanchez admits that the evidence established that he restrained Hernandez while holding a knife to Hernandez's throat, but he contends that he did so while believing that someone was going to harm him and while waiting for the police to arrive. He also emphasizes that he dropped the knife immediately when the police arrived and that he told the responding officers that he did not want to harm Hernandez. Additionally, he notes that one of the responding officers testified that nothing in her investigation revealed that he threatened to kill Hernandez. Moreover, Sanchez asserts that Hernandez only suffered a "superficial" wound to his cheek and that the State did not produce any evidence that the wound constituted a serious bodily injury. Further, he argues that there was no evidence that the knife was designed for the purpose of causing serious bodily injury or death or that it qualified as a deadly weapon through the manner of its use during the incident. For these reasons, Sanchez contends that the evidence was insufficient to support the deadly weapon finding and that the trial court's judgment should be modified to delete that finding.

The Penal Code contains a definition for items that are deadly weapons per se, including firearms and other items designed for the purpose of inflicting death or serious bodily injury, but also specifies that a deadly weapon can be "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ," and "'[b]odily injury' means physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8), (46).

"[N]ot all knives are manifestly designed, made, or adapted for the purpose of inflicting serious bodily injury or death." *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017). However, evidence will be sufficient to support that a knife is a deadly weapon "if the jury could have rationally found that [the defendant] used the knife in such a way, or intended to use the knife in such a way, that it was capable of causing serious bodily injury or death." *Id.* The State is not required to prove "that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). "The placement of the word 'capable' in the provision allows the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force." *Id.* However, the evidence must establish more than a hypothetical possibility that the object could cause death or serious bodily injury, and the assessment must be made "in light of the facts that actually existed when the felony was committed." *Johnston v. State*, 115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd on other grounds*, 145 S.W.3d 215 (Tex. Crim. App. 2004).

Although "the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used," *Tucker v. State*, 274 S.W.3d 688, 691-92 (Tex. Crim. App. 2008), a defendant need not have actually inflicted harm on the victim for a weapon to be a deadly one through its use or intended manner of use, *Johnson*, 509 S.W.3d at 323. In deciding whether a weapon is a deadly one through its use or intended use, appellate courts "consider words and other threatening actions by the defendant, including the defendant's proximity to the victim; the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon; and the manner in which the defendant used the weapon." *Id.* Additionally, courts may consider testimony by the victim explaining that the victim "feared death or serious bodily injury" and testimony regarding "the weapon's potential for causing death or serious bodily injury." *Romero v. State*, 331 S.W.3d 82, 83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). "No single factor is determinative, and each case must be examined on its own facts." *Nash v. State*, 175 S.W.3d 427, 430 (Tex. App.—Texarkana 2005, pet. ref'd). Additionally, "[e]xpert testimony is not required" to prove that an object is a deadly weapon. *See Rivera v. State*, 271 S.W.3d 301, 304 (Tex. App.—San Antonio 2008, no pet.).

As an initial matter, we note that the jury was able to review photos of Hernandez's injuries, *see Morales v. State*, 633 S.W.2d 866, 868-69 (Tex. Crim. App. 1982) (providing that "[t]he photograph of the wound suffered by complainant presented the jury with ample evidence" to conclude that defendant's "use of the knife . . . rendered it a deadly weapon"), and that the knife in question was admitted into evidence, which allowed the jury to "ascertain for itself whether the weapon had physical characteristics that revealed its deadly nature," *Robertson v. State*, 163 S.W.3d 730, 733 (Tex. Crim. App. 2005); *see Alvarado v. State*, 317 S.W.3d 749, 753 (Tex. App.—Beaumont 2010, pet. ref'd). Moreover, although no witness testified that the weapon

9

could cause serious bodily injury or death, Arredondo testified that the knife had a four-to-five-inch blade. Appellate courts have upheld deadly weapon findings for knives with similar blade lengths. *See Fortenberry v. State*, 889 S.W.2d 634, 637 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (four-and-one-half inch blade); *Booker v. State*, 712 S.W.2d 853, 856 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd) (five-inch blade).

To the extent that Sanchez suggests that the evidence regarding his being in a paranoid state should have prevented the jury from determining the knife was a deadly weapon, we note that the statutory definition does not support that suggestion because the definition focuses on whether the "the manner of [the item's] use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17). In other words, it is not necessary that the actor intend for death or serious bodily injury to happen. *McCain*, 22 S.W.3d at 503. Moreover, this Court previously determined that a defendant's "acting 'very paranoid'" weighed in favor of a determination that the knife he used was a deadly weapon. *See Cook v. State*, Nos. 03-08-00718—00719-CR, 2009 WL 3230790, at *7 (Tex. App.—Austin Oct. 9, 2009, pet. ref'd) (mem. op., not designated for publication). In any event, the jury was free to decide what weight to give to the evidence concerning his mental state at the time of the offense. *See Stahmann*, 602 S.W.3d at 577.

Additionally, prior to grabbing Hernandez, Sanchez threatened to kill himself and placed the knife at his own throat, indicating his belief that using that knife to stab someone in the neck could result in someone's death. *Cf. Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (noting that defendant's intent can be inferred from his acts, words, and conduct). Moreover, the evidence established that Sanchez used the knife to obtain compliance from Hernandez, Newman, and Arredondo. *See McCain*, 22 S.W.3d at 503 (noting that "the determining factor" in

10

deadly weapon analysis was that knife "was 'used' *in facilitating* the underlying crime" "to instill in the complainant apprehension, reducing the likelihood of resistance during the encounter").

Further, Sanchez moved toward Hernandez, used his arm to grab Hernandez by the neck, and held the knife close to Hernandez's throat and face. *See Hernandez v. State*, 649 S.W.2d 720, 722 (Tex. App.—Amarillo 1983, no pet.) (noting that placing blade against victim's throat helped convey "his intent to use the weapon in a deadly manner"); *see also Morales*, 633 S.W.2d at 868 (noting that "[a]lthough we cannot ascribe to common medical knowledge such as the position and function of the jugular vein and carotid artery, it is common knowledge that the throat is a particularly vulnerable part of the body, as exemplified by the popular expression 'go for the throat'"); *Swartz v. State*, 685 S.W.2d 492, 494 (Tex. App.—Fort Worth 1985, pet. ref'd) (noting when upholding deadly weapon finding that "a knife was held to her throat and not more than six inches from her face").

Moreover, although one of the officers testified that her investigation did not reveal any express threat by Sanchez to stab Hernandez, she also testified that threats can be conveyed physically. *See Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020) (recognizing that factfinder cannot "read an accused's mind" and that, therefore, it "must infer his mental state from his acts, words, and conduct"). In addition, Newman testified that Sanchez threatened to stab Hernandez while holding the knife, and it was for the jury to resolve any conflict in the evidence. *See Merritt*, 368 S.W.3d at 525-26; *see also Ortiz v. State*, 993 S.W.2d 892, 894, 896 (Tex. App.—Fort Worth 1999, no pet.) (determining that evidence was sufficient to show defendant used deadly weapon in part because it established that defendant made multiple threats to kill victim); *Hernandez*, 649 S.W.2d at 722 (concluding that evidence was sufficient to convict defendant of

11

aggravated assault with deadly weapon where he placed knife with eight-inch blade against victim's throat and announced his intention to cut her if she cried out).

In determining whether the knife was a deadly weapon, the jury was also aided by the evidence establishing that the blade of the knife went through Hernandez's cheek and then pierced his tongue, resulting in a knife wound to his cheek that was one-and-a-half inches long and required stitches. From this evidence, "the jury could have inferred the knife was sharp from the" wound. *See Swartz*, 685 S.W.2d at 493; *see also Roghair v. State*, No. 07-05-00414-CR, 2006 WL 1273816, at *1 (Tex. App.—Amarillo May 10, 2006, no pet.) (mem. op., not designated for publication) (emphasizing that weapon was used to pierce victim's cheek when determining that evidence was sufficient to support deadly weapon finding).

Even though no witness testified that Hernandez sustained a life-threatening wound and even though one officer testified that the treating physician described the cheek wound as a superficial one, the jury could have considered the injuries when determining whether the knife could have caused serious bodily injury or death. *See Tucker*, 274 S.W.3d at 692 (noting that stab wound going through arm "could easily have severed a major blood vessel or nerve" and that even though victim was fortunate to not receive more serious injury, "the weapon that caused her wound was *capable*, in its manner of use, of causing serious bodily injury"). Although Sanchez denied intending to hurt Hernandez and told one of the responding officers that Hernandez caused the injuries, the jury was tasked with deciding what weight, if any, to give that evidence. *See Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (explaining that factfinder "was free to disregard appellant's self-serving testimony").

Given our standard of review and considering the reasonable inferences that the jury could have made from the evidence summarized above, we conclude that the jury could have

rationally concluded that the knife used in this case was a deadly weapon. *See* Tex. Penal Code § 1.07(a)(17); *see also Cook v. State*, 99 S.W.3d 310, 312-13, 316 (Tex. App.—Eastland 2003, no pet.) (concluding that evidence was sufficient to establish that knife was deadly weapon where victim testified that defendant had knife, poked her, held knife to her throat, and dragged knife down her back and arm and where photos showed cuts that she sustained).

For these reasons, we overrule Sanchez's issue on appeal.

## CONCLUSION

Having overruled Sanchez's issue on appeal, we affirm the trial court's judgment of conviction.

_____

Karin Crump, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed:   January 31, 2025

Do Not Publish

13